Filed 10/19/22  In re R.D. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re R.D., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH & HUMAN SERVICES AGENCY, | D080435 |
| Plaintiff and Respondent, | (Super. Ct. No. J520966) |
| v. | |
| J.D., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia Silva, Acting County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

J.D. (Mother) appeals a jurisdictional and dispositional order in the Welfare and Institutions Code section 300[1] dependency proceeding pertaining to her daughter, R.D.  Mother argues that the juvenile court's jurisdictional finding under section 300, subdivisions (a) and (b)(1) is not supported by substantial evidence.  Mother also argues that there is not substantial evidence supporting the court's order removing R.D. from her custody under section 361, subdivision (c).  We conclude that there is substantial evidence to support the juvenile court's jurisdictional finding and removal order.  Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.  Events Leading to Petition

R.D. is a nine-year-old medically fragile child diagnosed with Rett syndrome.  Rett syndrome is a rare genetic mutation affecting brain development in females.  Infants appear to be healthy during their first six months of life, but over time, rapidly lose coordination, speech, and use of their hands.  There is no cure, but medications, physical and speech therapy, and nutritional support help to manage symptoms, prevent complications, and improve quality of life. R.D. experiences seizures, which require the administration of phenobarbital to control.  R.D. is nonverbal and relies solely on her parents and caregivers to meet her basic needs and for her survival.  At the time of the underlying incident, R.D. resided with Mother.  R.P.D. (Father)[2] had resided out of the home for just over one year and filed for divorce two years prior to the filing of the petition in this case.

---

[1]     All further section references are to the Welfare and Institutions Code, unless otherwise indicated.

[2]     Father is not a party to this appeal.

On February 9, 2022, the Agency received a report stating that Mother had sent rambling emails with accompanying photos to the chief medical officer of a hospital. The emails contained statements that were scattered, paranoid, and irrational. In one photo, Mother was hugging R.D. while R.D. appeared to be asleep. In another photo, R.D. was sleeping on a bed with a sheet wrapped around her all the way up to her eyes and there were jars arranged around her and a white object balanced on her forehead. Mother also sent photos of notes that she had written about sexual predators, COVID-19, a 24-hour vow of silence, respecting her privacy, and "transparency of enemy of freedom."

On February 10, 2022, a reporting party called police to request that the police perform a welfare check and bring R.D. into the hospital to be evaluated. When police and paramedics arrived at Mother's home, they found R.D. to be unresponsive and "floppy" while being held by Mother on Mother's shoulder. R.D. appeared "malnourished, unresponsive, lethargic, over medicated and with bruises all over her body." Mother explained to the officer that R.D. appeared lethargic as a result of her seizure medicine. According to the officer, Mother presented as "[m]anic, talking fast and then would be touching her eyelids stating, I just channeled someone." Mother also presented as "hyper-verbal and tangential. Would switch between topics and needed redirection to stay on topic and answer direct questions regarding pt's medical care."

At the hospital, a social worker stayed with Mother while a medical team assessed R.D. The social worker reported that Mother continued to appear frantic with labile affect. She would alternate between crying and laughing, and stated that she wanted to take a 24-hour vow of silence but agreed to wait to take the vow so that she could communicate with the

medical team. She began to make grandiose statements about needing to go to Sycuan reservation because she would be protected once she was on their soil. She also claimed that if she did not go to the reservation, she would not be able to close a 2.5 million dollar deal. As a result of her bizarre behavior, Mother was placed on a section 5150 hold for grave disability.

On February 10, 2022, Father reported that Mother had been "a little bit off the last couple of days," and said that Mother "gets in these phases that I've seen before and you just try to make sure everything is okay." Father explained that Mother has "bad days" that are not ordinary, where she "makes stuff up that does not line up." However, there has never been a time when Father felt that Mother would harm herself or R.D. Father stated that Mother is an "amazing mom" but added that she is manic and bipolar and is not "mentally in a good place."

On February 14, 2022, Mother told a social worker that on the morning of the incident, she and R.D. were doing "Kung Fu Panda." Mother explained that she was taught in the Intensive Care Unit (ICU) how to cup her hand and bang on R.D.'s chest "to move her mucus around in her body." She demonstrated by hitting her own chest with both of her hands cupped and explained, "you have to do it hard, so that the energy can get to the illness and move throughout the body." Mother stated that she had been doing the cupping for about three days and said that if R.D. had bruising on her sides, it was from Mother banging on her chest and body to break up the mucus inside her body. Mother claimed that if she did not perform this procedure, R.D. would be on a ventilator due to COVID-19.

Mother also stated that the bruising on R.D.'s cheek and neck was due to Mother forcing R.D.'s mouth closed, to get her to swallow medication.

4

Mother stated "[t]hat bruise came from me, making her take her meds, so she did not have to go to the emergency room."

Mother claimed that one of R.D.'s bruises was due to R.D. losing her balance and falling into the side of a headboard of a bed. At one point, Mother also stated that R.D.'s bruises had been caused by Mother lifting her in and out of a bathtub. Mother also stated that the bruising might be self-inflicted or the result of R.D. falling when she is walking or standing.[3]

Regarding the emails that Mother sent to the hospital's chief medical officer, Mother admitted that they were inappropriate but stated "I had a high fever, so I was not thinking straight." Mother stated that she had been placed on section 5150 holds in the past, and said that she currently meets with a psychiatry team. The Agency reported that Mother expressed how much she loves R.D. and described her efforts to advocate for R.D. and her medical condition.

Dr. Shalon Nienow, a child abuse pediatrics specialist performed an inpatient consultation. Dr. Nienow noted that R.D. had "bruising on the left cheek and angle of the jaw." Mother admitted having caused these injuries by grabbing R.D.'s jaw in order to "force" medication into her mouth. Dr. Nienow opined that this bruising was "definitive of physical abuse." Mother also admitted causing bruising on R.D.'s left chest by performing "cupping." Dr. Nienow noted that cupping is often used as a therapeutic modality to break up mucus in the chest, but said that it should not cause bruising. Additionally, using force great enough to cause injury "is well

---

[3]     The Agency reported that a nurse indicated that children with Rett syndrome do not necessarily bruise more easily than other children, but because R.D. is ambulatory, like a toddler who bumps into things, R.D. is prone to bruising on her legs, arms, or knees.

5

outside the realm of normal care and handling and is diagnostic of physical abuse." Mother was also witnessed behaving aggressively toward R.D., such as forcibly placing a finger into R.D.'s mouth when R.D. did not open her mouth for food, repositioning her forcefully, and placing a hard vibrating speaker against her chest with unnecessary force.

Dr. Nienow noted that R.D. also presented with a cluster of petechial bruising on the left side of her neck, left side of the chest, left side of the abdomen, and surrounding her umbilicus. Dr. Nienow opined that this bruising was more likely than not inflicted. Petechiae bruising can be the result of traction on the skin or high velocity impact injury. Dr. Nienow noted that the injury on the left side of R.D.'s neck was highly suspicious for the possibility of strangulation injury. Further, when R.D. arrived at the emergency department, her blood oxygen level was desaturated and she required administration of oxygen.

Dr. Nienow also noted bruising on other areas of R.D.'s body including her left hip, upper left thigh, anterior thighs and knees, left shin, left foot, back, right flank, and right posterior forearm and elbow. Dr. Nienow opined that some of these bruises may have been the result of accidental injury but factors such as patterned injury and bruising on multiple body planes, some on relatively protected areas, was more indicative, in his view, of inflicted injury. He further explained that some of the injuries could be the result of falls due to R.D.'s unsteady gait. However, he stated that if R.D. is falling frequently and forcefully enough to cause injury, then independent ambulation should be discouraged. According to Dr. Nienow, the failure to assist ambulation to prevent injury is indicative of neglect.

Dr. Nienow expressed significant concerns regarding Mother's ability to safely care for R.D. because Mother clearly demonstrated symptoms of severe

mental illness including flight of ideas, labile affect, grandiose thinking, and paranoid thoughts. He explained that caregivers with uncontrolled mental health concerns may not be able to safely care for children or respond to an emergency.

## B. Petition and Detention Hearing

On February 23, 2022, the Agency filed a petition on behalf of R.D. Count one under section 300, subdivision (a), alleged that R.D. had suffered, or that there was a substantial risk that R.D. would suffer, serious physical harm inflicted nonaccidentally by Mother. The Agency alleged the following factual bases for this count:[4]

> "On or about February 10, 2022 the child's mother subjected the child to serious physical harm and the substantial risk thereof, including, physical abuse and damage, to wit, bruising on said child's cheeks due to mother squeezing the child's jaw and bruising on the chest, which a Child Abuse Expert opines is diagnostic of physical abuse. Further, in the mother's care, the child also sustained petechial bruising on the left side of her neck, left side of the chest, left side of the abdomen and surrounding her umbilicus[,] which the Child Abuse Expert opines is inflicted trauma. Accordingly, the child suffered serious physical harm inflicted non-accidently."

The Agency asserted a second count under section 300, subdivision (b)(1), alleging that R.D. had suffered or that there was a substantial risk that R.D. would suffer serious physical harm or illness due to Mother's inability to provide regular care for R.D. as a result of Mother's mental

---

[4] After trial, the juvenile court modified the language regarding the factual bases for the petition, to conform to the evidence presented at trial. Thus, we quote and address the allegations of the petition as modified.

illness, developmental disability or substance abuse.  The Agency alleged the following factual bases for this count:[5]

> "On or about February 10, 2022 the mother had a mental illness, as evidenced by, but not limited to, becoming frantic with labile affect, grandiose thinking and paranoid thoughts which led to the mother being placed on a WIC § 5150 hold due to being gravely disabled.  On 2.10.22 while in the care of the mother, the child was admitted to the hospital with bruises all of [*sic*] her body[,] which a Child Abuse Expert has opined are a result of both neglect and physical abuse by the mother.  Accordingly, the mother is incapable of providing regular care for said child.  Additionally, said child's father has been unable to protect said child, and thus the child is in need of the protection of the Juvenile Court."

In its detention report, the Agency stated that it had previously intervened with the family approximately nine times due to concerns about Mother's mental health and domestic violence between Mother and Father.  The Agency advised that because R.D. is medically fragile and semi-ambulatory, she requires an attentive and safe caregiver at all times—one who is not only physically present, but present with a clear mental state.

The Agency reported that R.D. was currently on a safety plan with Father, who had recently moved into Mother's home; Mother had moved in with a maternal aunt.  The Agency recommended that R.D. be detained in the home with Father on the condition that Mother not reside in the home, and that reunification services be provided for Mother and family maintenance services be provided for Father.

At the detention hearing on February 25, 2022, the court made a prima facie finding that R.D. is a child as described by section 300, subdivisions (a)

---

[5]    See footnote 2, *supra*.

and (b)(1) and that R.D.'s initial removal from Mother's custody was necessary. The court ordered R.D. detained with Father on the condition that Mother not reside in the home. The court granted visitation to be supervised by Agency staff and not by Father. The court set the jurisdiction and disposition hearing for March 17, 2022.

C. Jurisdiction and Disposition Report

In its March 17, 2022 jurisdiction and disposition report, the Agency reported that Mother enrolled in treatment with a mental health program on February 26, 2022. Mother was reportedly motivated to be in treatment and attended all groups and sessions. The program was about 30 days long, after which time Mother would be assessed to determine whether she "need[ed] to drop to a lower level." The case manager indicated that they would likely recommend that Mother attend an outpatient program to assist her in integrating back into society and ensure that she has a psychologist and psychiatrist available once she is at home. The case manager also stated that Mother loves R.D. and speaks about her often.

Father stated that when Mother sent the emails to the hospital's chief medical officer, Mother and R.D. both had COVID-19, Father had not seen them for 10 days, and Mother and R.D. were on their own. Father stated that Mother can become "manic" when she is not sleeping. She has had manic episodes before and has been subject to section 5150 holds in the past. Father indicated that Mother has been trying to use medication and work with therapy to improve her condition, but nothing has "ever stuck." This was the first time that Mother had started treatment, but Father did not know if 30 days would be enough time.

The Agency was not able to interview Mother, partially due to her being in the residential mental health treatment program. The Agency

9

indicated that because of the pervasiveness and acuteness of Mother's mental health issues, it would be important for her to demonstrate over time consistent follow up with mental health providers once she is discharged from her inpatient program. The Agency maintained its recommendation that R.D. be detained in the home with Father on the condition that Mother not reside in the home, and that Mother's visitation be supervised by someone other than Father. The Agency recommended family maintenance services for Father including mental health family support groups and family enhancement services for Mother with mental health services and psychotropic medication monitoring.

The court set a pretrial status conference for April 6, 2022 and a contested adjudication and disposition hearing for April 28, 2022.

### D. Addendum Reports

In its April 6, 2022 addendum report, the Agency reported that on March 16, 2022, Mother stated that both she and Father need a night nurse to help monitor R.D. because R.D. has almost died from seizures. When asked what her understanding of the case was, Mother stated that she was overwhelmed with the care of R.D. According to Mother, weaning R.D. off of phenobarbital caused R.D. to have insomnia, which in turn caused Mother to have insomnia. Mother stated that she was traumatized and that she "experienced prolong[ed] and severe insomnia and forces beyond my control." She claimed that she was trying various medications and was making progress with her sleep. Mother believed that obtaining a night nurse and working on her sleep would help mitigate and manage her mental health issues. She was discharged from inpatient behavioral health treatment on March 30, 2022. She would not agree to participate in a TERM Child Abuse Group and indicated that she would have her own therapist and psychiatrist.

10

When asked about the physical harm allegations, Mother maintained that R.D. will self-harm when she is sick or in distress. Mother explained that R.D. walks and when she is sick, she will walk into a door or couch. Mother claimed that at the time of the events that led to the filing of the dependency petition, both she and R.D. had a 103 degree fever and had not slept. Mother said that she had done the best she could. Mother was proud of her cupping and thought she did "an amazing job with clearing [R.D.'s] lungs."

The Agency reported that Dr. Mark Nespeca, who had been working with the family for about six years, stated that he believes that Mother and Father really love R.D. and want to do what is best for her. He also stated that it has been difficult working with Mother because she frequently presents as manic, does not present with logical thoughts, and this makes communication difficult. He indicated that R.D.'s medical condition is very complex and stated that it is "a rollercoaster taking care of this child."

The Agency indicated concern that, due to Mother's mental health status, she is unable to safely care for R.D. and meet R.D.'s complex medical needs.

In its April 28, 2022 addendum report, the Agency reported having spoken with Grace Bazin, a registered nurse who worked with the family five to six years prior; she had not seen them since that time. Ms. Bazin stated that self-harm behaviors are common in patients with Rett syndrome, such as punching the head, pulling hair, scratching, or head banging on walls or floors. She recalled that the self-injurious behaviors that R.D. engaged in were trying to hit herself, and unintentionally scratching herself on her face and head.

Dr. Nienow stated that there is no association between Rett syndrome and bruising easily. R.D. bruises in the same way most children do, and he would expect bruising to be overlying bony prominences. If some injuries were the result of falls, that would indicate that R.D. was not appropriately protected. He also opined that the extent of R.D.'s bruising indicated that it was not the result of self-injurious behaviors. Dr. Nienow found it notable that Mother admitted that she had caused R.D.'s bruising, which he stated is indicative of abuse. Additionally, there were no indications of reported self-injurious behaviors in R.D.'s medical records and no bruising had been documented since R.D. was placed in Father's care.

A social worker spoke with Mother's therapist, Katheryn Weins, who had been working with Mother since January 2021. Ms. Weins saw Mother every week. However, there were periods when Mother stopped attending sessions because things in her life were more stressful than usual. The therapist indicated that Mother presented with a mood disorder and displayed manic phases. She is helping Mother to be properly medicated so that she can function. Mother's psychologist, Dr. Zalewski, indicated that his current concern is Mother's continued fast-paced talking and said that he is currently adjusting her medication and meeting with her weekly until this issue has been addressed.

E. Jurisdiction and Disposition Hearing

At the jurisdiction and disposition hearing on April 28, 2022, the Agency recommended removing R.D. from Mother and placing R.D. with Father on the condition that Mother not reside in the home with Father. The Agency also recommended family maintenance services for Father, family enhancement services for Mother, and supervised visits for Mother. In support of its recommendations, the Agency acknowledged that Mother is

12

working with mental health professionals, but argued that she is still suffering from symptoms such as mood disorder and manic phases, and her medication is still in the process of being adjusted.

R.D.'s guardian ad litem agreed that the Agency had met its burden on the petition and also agreed with the Agency's recommendations regarding disposition.

Mother argued that the Agency had not met its burden to prove that Mother intentionally inflicted injuries on R.D. Mother argued that the Agency intervened at a time when Mother was pushed to her limits because she was not able to sleep and not able to fully take care of R.D. Mother maintained that she never intended to hurt R.D.

The court found the allegations in the petition true by a preponderance of the evidence and further found that R.D. is a person described within section 300 subdivisions (a) and (b)(1). As to disposition, the court found by clear and convincing evidence that removal of R.D. from Mother's custody was appropriate under section 361, subdivision (c)(1).

DISCUSSION

Mother contends that the juvenile court's jurisdictional finding and dispositional order are not supported by substantial evidence. We disagree.

A. Jurisdiction Finding

On appeal, we review the record for substantial evidence to support the juvenile court's section 300 jurisdictional findings. (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137.) In so doing, we consider the entire record, draw all reasonable inferences in favor of the prevailing party, and affirm the order if substantial evidence supports court's findings. (*Id.* at pp. 137–138.) A finding is supported by substantial evidence if a trier of fact could reasonably make that finding in light of the entire record. (*In re Savannah M.* (2005)

13

131 Cal.App.4th 1387, 1393–1394.).)  We must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding.  (*In re N.M.* (2011) 197 Cal.App.4th 159, 168 (*N.M.*).)  The appellant has the burden to show that there is insufficient evidence to support the juvenile court's order.  (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103 (*Lana S.*); *N.M.*, at p. 168.)

Juvenile dependency proceedings are intended to protect children who are currently being abused or neglected, "and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.)  Although "the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm" (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824), the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection.  (*In re Troy D.* (1989) 215 Cal.App.3d 889, 899–900.)  A parent's past conduct is a good predictor of future behavior.  (*In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169–1170.)

1.  Jurisdiction Under Section 300, Subdivision (a).

Mother argues that there is not substantial evidence to support a finding that Mother "physically abused" R.D. or put R.D. at risk of future harm to warrant jurisdiction under section 300, subdivision (a).

Section 300, subdivision (a)(1) authorizes dependency jurisdiction if a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. . . . [A] court may find there is substantial risk of serious future injury based on the manner in which less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings,

or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm."

As an initial matter, Mother argues that even if the Agency presented prima facie evidence that R.D. is a person described by section 300, subdivision (a), Mother rebutted the presumption under section 355.1. This argument is irrelevant. Section 355.1 provides that "[w]here the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent . . . that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." However, the court did not find jurisdiction under section 300, subdivision (a) based on a presumption that R.D.'s injuries would not have been sustained but for Mother's neglectful acts or omissions, under section 355.1. Rather, the court found that the allegations in the petition in count one under section 300, subdivision (a) were true by a preponderance of the evidence and that, based on those allegations, R.D. is a person described within section 300, subdivision (a).

Count one of the petition alleged:

> "On or about February 10, 2022 the child's mother subjected the child to serious physical harm and the substantial risk thereof, including, physical abuse and damage, to wit, bruising on said child's cheeks due to mother squeezing the child's jaw and bruising on the chest, which a Child Abuse Expert opines is diagnostic of physical abuse. Further, in the mother's care, the child also sustained petechial bruising on the left side of her neck, left side of the chest, left side of the abdomen and surrounding her umbilicus[,] which the Child Abuse Expert opines is inflicted trauma. Accordingly, the child suffered serious physical harm inflicted non-accidently."

15

Based on our review of the record, substantial evidence supports the juvenile court's true finding on the section 300, subdivision (a) allegations in the petition. The hospital report indicated that R.D. presented on February 10, 2022 with "bruising on the left cheek and angle of the jaw." Mother admitted having caused these injuries by grabbing R.D.'s jaw in order to "force" medication into her mouth. Dr. Nienow opined that this bruising was "definitive of physical abuse," given the fact that mother disclosed that she had caused the facial bruising. Mother also admitted causing bruising on R.D.'s left chest by performing the "cupping" procedure on her. Dr. Nienow noted that "cupping" is often used as a therapeutic modality to break up mucus in the chest, but stated that it should not cause bruising. Using force great enough to cause injury "is well outside the realm of normal care and handling and is diagnostic of physical abuse." Dr. Nienow also observed petechial bruising on the left side of R.D.'s neck, left side of the chest, left side of the abdomen, and surrounding her umbilicus, which Dr. Nienow opined was more likely than not inflicted. Dr. Nienow reported that petechial bruising can be the result of traction on the skin or high velocity impact injury. In sum, the hospital records and Dr. Nienow's reports constitute substantial evidence to support the juvenile court's findings that the allegations in count one of the petition were true, and that R.D. had suffered serious physical harm inflicted nonaccidentally by Mother, bringing R.D. within the court's jurisdiction under section 300, subdivision (a).

Mother argues that there is not substantial evidence to support a finding of risk of future injury based on the manner in which a less serious injury was inflicted, a history of repeated infliction of injuries, or a combination of actions by the parent indicating that the child is at risk of

16

serious physical harm. However, the jurisdictional finding under section 300, subdivision (a) was not based on a risk of future injury but rather, on the ground that R.D. "has suffered . . . serious physical harm" inflicted nonaccidently by Mother. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1434–1435 [evidence of prior serious harm is sufficient, standing alone, to establish jurisdiction under section 300, subdivision (a).)

Regarding the physical harm that R.D. did suffer, Mother argues that she did not "purposefully harm" R.D, urging that she loves R.D. and that all of the actions that she has undertaken were done in R.D.'s best interests. In support of her argument, Mother relies on evidence showing that she used the "cupping" technique taught to her by medical professionals, which caused bruising on R.D.'s chest. She also admits to forcing medication into R.D.'s mouth, which caused bruising on R.D.'s cheek, but contends that this was necessary. "Nonaccidental" generally means that a parent or guardian "acted intentionally or willfully." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601.) While Mother may not have intended to harm R.D., the evidence presented supports a finding that her actions that caused the extensive bruising were done intentionally and willfully.

Mother also argues that self-harm and self-injurious behaviors are common in those with Rett syndrome. In making this argument, Mother misconstrues and/or misapplies the substantial evidence standard of review. This court must affirm the juvenile court's jurisdictional finding where it is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding. (*N.M.*, *supra*, 197 Cal.App.4th at p. 168.) Regardless, Mother admitted having caused the bruising on R.D.'s cheek and chest. However, in *Isabella F.*, the court first concluded that the minor's injuries did not amount to "serious physical

17

harm." (*Id.* at p. 138 [injuries included scratches, consistent with fingernail scratches on one side of the minor's face and a gouge mark on her left earlobe, also consistent with a fingernail injury].) The court then acknowledged that section 300, subdivision (a) may apply when a minor suffers less serious injuries but there is a history of repeated abuse. The court concluded that this standard did not apply to Isabella because the minor injury was an isolated event. (*Id.* at p. 139.) In contrast, in the present case, R.D.'s injuries were not minor. The evidence in the record supports a finding that R.D.'s injuries amounted to "serious physical harm."

  2. Section 300, Subdivision (b)(1).

  Mother also argues that there is not substantial evidence to support the jurisdiction finding under section 300, subdivision (b)(1).

  Section 300, subdivision (b)(1) authorizes dependency jurisdiction if a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."

  Count two of the petition alleged that on February 10, 2022, Mother suffered from a mental illness, as evidenced by becoming frantic with labile affect, grandiose thinking and paranoid thoughts, which led to Mother being placed on a section 5150 hold due to being gravely disabled. The petition further alleged that on February 10, 2022, while in the care of Mother, R.D. was admitted to the hospital with bruises, which a child abuse expert opined were a result of neglect and physical abuse by Mother. Accordingly, Mother is incapable of providing regular care for R.D. and Father has been unable to protect R.D.

18

Based on our review of the record, substantial evidence supports the juvenile court's true findings on the section 300, subdivision (b)(1) allegations in the petition. As discussed above, on November 10, 2022, R.D. presented with bruising on her cheek, jaw, and chest, which Dr. Nienow opined was indicative of physical abuse by Mother. Additionally, Dr. Nienow noted bruising on other areas of R.D.'s body including her left hip, upper left thigh, anterior thighs and knees, left shin, left foot, back, right flank, and right posterior forearm and elbow. Dr. Nienow opined that some of these bruises may be the result of accidental injury but in his view, factors such as patterned injury and bruising on multiple body planes, some on relatively protected areas, was more indicative of inflicted injury. Regardless, if the injuries were a result of R.D.'s falling due to an unsteady gait, Dr. Nienow opined that the failure to assist R.D. in order to prevent such injury is indicative of neglect.

There is also substantial evidence to support the allegations regarding Mother's mental illness. When police arrived at Mother's home on February 10, 2022, the record shows that Mother presented as manic and hyper-verbal, and was touching her eyelids while stating that she had "channeled someone." While at the hospital that day, the record shows that Mother continued to appear frantic with labile affect. She also made grandiose statements regarding needing to go to the Sycuan reservation to close a 2.5 million dollar deal. As a result, Mother was placed on a section 5150 hold for grave disability.

Mother argues that the allegation that she suffers from a mental illness cannot provide the basis for jurisdiction because the incident resulting in her section 5150 hold was an isolated one and there was no evidence of a risk of future harm where Mother took immediate steps to obtain treatment. The

19

record does not support Mother's claims. Mother and Father both indicated that Mother has been placed on section 5150 holds in the past. Father reported that Mother "gets in these phases" and has "bad days" when she "makes up stuff that does not line up." Mother's therapist, Ms. Weins, with whom Mother had been working since January 2021, also reported that Mother presented with a mood disorder and that she displays manic phases. Further, Dr. Nespeca, who had been working with the family for approximately six years, stated that Mother frequently presents as manic, does not present with logical thoughts, and that this makes communication difficult. While Mother did complete a 30-day inpatient mental health program, she was discharged on March 30, 2022, just 28 days before the jurisdiction and disposition hearing. Further, Mother's psychologist, Dr. Zalewski indicated that he was still concerned about Mother's fast-paced talking and was continuing to adjust her medication and meeting with her weekly until this concern was addressed.

This case is distinguishable from those cited by Mother. In *In re A.L.* (2017) 18 Cal.App.5th 1044, the mother had been diagnosed with schizophrenia for some time, but the incident at issue was the first time the family had sought assistance from law enforcement, and the incident occurred after the mother stopped taking her medication. She was placed in a psychiatric facility until her condition could be stabilized, and resumed taking her medication once she left the facility. (*Id.* at p. 1051.) In *In re Daisy H.* (2011) 192 Cal.App.4th 713, while the father was described as paranoid and hallucinatory, there was no evidence linking these alleged mental disturbances to physical harm or risk of physical harm to the children where the minor who was living with the father "appeared healthy and well groomed" and did not have "any visible and/or suspicious marks or bruises."

20

(*Id.* at p. 718.)  In contrast, in this case, this was not the first time that Mother was placed on a section 5150 hold, Mother's psychologist still had concerns about Mother's condition and was continuing to adjust her medication, and R.D. did suffer injuries while in Mother's care.

Finally, Mother disputes the allegation that she was incapable of providing regular care for R.D., noting that she had previously cared for R.D. for nine years as the primary care provider "seemingly without issue," and Dr. Nespeca and Father believed that Mother loved and would not harm R.D. Mother again misconstrues and/or misapplies the substantial evidence standard of review.  (*N.M.*, *supra*, 197 Cal.App.4th at p. 168.)  Again, we must affirm the court's jurisdictional finding where it is supported by substantial evidence even if other evidence would have supported a contrary finding.  (*Ibid.*)  Further, the statute provides for jurisdiction under section 300, subdivision (b)(1) if a child has suffered serious physical harm as a result of the inability of the parent to provide regular care for the child due to the parent's mental illness.  While Mother may love R.D. and have good intentions, as discussed above, substantial evidence supports the juvenile court's findings that the allegations in count two of the petition were true, bringing R.D. within the court's jurisdiction under section 300, subdivision (b)(1).

In summary, substantial evidence supports the court's jurisdictional findings under section 300, subdivisions (a) and (b)(1).

### B.  Removal from Custody

Mother further challenges the sufficiency of the evidence to support the court's dispositional order removing R.D. from her custody under section 361, subdivision (c).

After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child. (§§ 360, subd. (d), 361, 362; *N.M.*, *supra*, 197 Cal.App.4th at p. 169.) The court has broad discretion in choosing an appropriate disposition that serves the child's best interests. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

Section 361, subdivision (c), provides in pertinent part: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c).)

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of potential detriment to the child if he or she remains with the parent." (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 169.) "In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) A child does not have to be "actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135–136.)

We review a removal order for substantial evidence. (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.) Because section 361, subdivision (c) requires proof

22

by clear and convincing evidence, we determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 (*O.B.*); see also *In re V.L.*, at pp. 154–155 [standard of review described in *O.B.* applies to removal findings under § 361, subd. (c)].) Still, we must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding. (*N.M.*, *supra*, 197 Cal.App.4th at p. 168.) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*In re V.L.*, at p. 154.) On appeal, the party challenging the juvenile court's order has the burden to show that there is insufficient evidence to support the court's decision. (*In re Lana S., supra,* 207 Cal.App.4th at p. 103; *In re N.M.*, *supra*, 197 Cal.App.4th at p. 168.)

We conclude that there is substantial evidence to support a finding that R.D. faced a substantial risk of harm if she were returned to Mother's custody due to Mother's mental illness, which was unresolved and in the process of being treated. Mother argues that at the time of the jurisdictional and dispositional hearing, Mother had received treatment and was no longer suffering from sleep deprivation. However, it is not this court's role on appeal to reweigh the evidence. Rather, our task is to determine whether " 'it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' " (*In re Savannah M., supra*, 131 Cal.App.4th at p. 1394.) The juvenile court could have reasonably concluded that it was highly probable that R.D. would be at risk of harm if she were not removed from Mother's custody based on evidence that Mother had completed her inpatient program just 28 days prior to the hearing, and that Mother's psychologist still had

concerns about Mother's mental state and was continuing to adjust Mother's medication.

Additionally, substantial evidence supports a finding that R.D. faced a substantial risk of harm if she were returned to Mother's custody due to the serious physical harm that Mother inflicted on R.D. nonaccidentally. As of March 16, 2022, Mother still did not believe that she had done anything wrong by "cupping" R.D. to the point of causing bruising; instead, Mother thought that she had done "an amazing job" clearing R.D.'s lungs. Also as of March 16, 2022, Mother still claimed that R.D. would self-harm or walk into things. On appeal, Mother argues that Father did not believe that Mother would harm R.D. and contends that she did not purposefully harm R.D., although she acknowledges causing bruising to R.D. by forcing her to take medication and performing "cupping." Mother also relies on evidence that children with Rett syndrome can bump into things, causing bruising. Mother's statements on March 16, 2022, and her arguments on appeal highlight Mother's lack of insight into the risk of physical harm caused by her own actions and her neglect in failing to assist R.D. while R.D. is walking. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"]; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].)

In summary, substantial evidence supports the juvenile court's findings, under a clear and convincing standard, that there would be a substantial risk of danger to R.D. if she were returned to Mother's custody, and that there was no reasonable means other than removal from Mother's custody to protect R.D.

## DISPOSITION

The juvenile court's jurisdiction and disposition order is affirmed.


AARON, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.